# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

JAVIN KYLE LATIMORE,

      Plaintiff,                           Case No. 14-13997

v.                                          Hon. Gerald E. Rosen

ROBERT J. PICKELL, *et al.,*

      Defendants.

_____/

## OPINION AND ORDER REGARDING
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____December 27, 2016_____

PRESENT:  Honorable Gerald E. Rosen
United States District Judge

## I.  INTRODUCTION

Plaintiff Javin Kyle Latimore commenced this action in this Court on

October 16, 2014, asserting federal claims of excessive force under 42 U.S.C. §

1983 and a variety of state-law claims against Genesee County Sheriff Robert J.

Pickell, Genesee County Undersheriff James Gage, and fifteen other law

enforcement officers employed by the Genesee County Sheriff Department.[1]

_____

[1]Prior to the close of discovery, Plaintiff's claims against Undersheriff Gage were
dismissed by stipulation of the parties.  In addition, Plaintiff has agreed to the dismissal of

Plaintiff's claims arise from a March 26, 2013 incident in which he was subjected to various forms of force at the City of Flint lockup and the Genesee County Jail following his arrest for trespass when he allegedly refused the order of two non-party City of Flint police officers to leave a Flint restaurant. This Court's subject matter jurisdiction rests upon Plaintiff's assertion of claims arising under federal law. *See* 28 U.S.C. § 1331.

Through the present motion, the Defendant law enforcement officers seek an award of summary judgment in their favor on each of Plaintiff's remaining federal and state-law claims. In support of this motion, Defendants argue (i) that the claims asserted against the Defendant officers in their official capacity are inadequately pled and lack evidentiary support, (ii) that Plaintiff has failed to produce evidence in support of his claims against Sheriff Pickell, (iii) that the Defendant law enforcement officers did not use excessive force in their interactions with Plaintiff or, at a minimum, are entitled to qualified immunity from liability for Plaintiff's claims of excessive force, and (iv) that Plaintiff's state-law claims of assault and battery are defeated by his active resistance to the

---

his claims against three other Defendant officers: Genesee County Deputies Radmilla Hovey and Timothy Lynch and Sergeant Pete Stocchi. Finally, Plaintiff has acknowledged that his state-law claims of false arrest, false imprisonment, and civil conspiracy are subject to dismissal, leaving assault and battery as the only theories of recovery that Plaintiff is still pursuing under state law.

2

Defendant officers' verbal commands and lawful efforts to restrain him.

Defendants' motion has been fully briefed by the parties. Having reviewed the parties' briefs and their accompanying exhibits, as well as the remainder of the record, the Court finds that the relevant allegations, facts, and legal issues are sufficiently presented in these written submissions, and that oral argument would not aid the decisional process. Accordingly, the Court will decide Defendants' motion "on the briefs." *See* Local Rule 7.1(f)(2), U.S. District Court, Eastern District of Michigan. This opinion and order sets forth the Court's rulings on this motion.

## II. <u>FACTUAL BACKGROUND</u>

The facts underlying the March 26, 2013 incident giving rise to this suit are the subject of considerable disagreement and dispute among the parties. In accordance with the present, summary judgment posture of this case, the following account is based on a view of the record in a light most favorable to Plaintiff as the non-moving party.

On March 26, 2013, Plaintiff Javin Latimore — who was then twenty-three years old — visited three bars and restaurants in downtown Flint, Michigan, consuming a few glasses of wine over the course of the evening. Plaintiff's last stop that night was the Blackstone restaurant, where he sat at the bar and asked for

a drink menu.  Before he could order a drink, however, the bartender told Plaintiff

to "leave or he was going to call the police," without giving any reason.

(Defendants' Motion, Ex. C, Plaintiff's Dep. at 37.)[2]  The bartender then made a

phone call, and two City of Flint police officers arrived at the scene.  (*See id.* at

37-38.)

 Upon the arrival of the Flint police, Plaintiff approached one of the officers

and insisted that he had done nothing wrong.  (*See id.* at 39.)  The officer

responded that "you can't come into people's establishments if you're unwanted,"

and Plaintiff was placed under arrest.  (*Id.* at 40.)  The police report for this

incident states that Plaintiff was ordered three times to leave the bar and refused

each of these orders, (*see* Flint Police Report at 2), but Plaintiff denies that he was

given any such warning before being arrested, (*see* Plaintiff's Dep. at 39-40).  The

police report further indicates that Plaintiff was arrested for trespassing, (*see* Flint

Police Report at 2), but Plaintiff testified that he was not told why he was being

arrested, (*see* Plaintiff's Dep. at 41).

 Following his arrest, Plaintiff was placed in handcuffs and transported to the

---

[2]According to a report prepared by a non-party City of Flint police officer, the bartender stated that after he served Plaintiff a drink, Plaintiff "became verbally abusive" and began yelling and cursing at the bartender.  (Defendants' Motion, Ex. D, Flint Police Report at 2.)  Plaintiff, however, has denied that he verbally abused or cursed at the bartender.  (*See* Plaintiff's Dep. at 36-37.)

City of Flint lockup, which was run by the Genesee County Sheriff Department. Upon his arrival at the lockup, Plaintiff was led to an intake area and told to sit on a bench. (Plaintiff's Response, Ex. A, Plaintiff's Dep. at 52-53.)[3] According to Plaintiff, as he moved to one end of the bench and attempted to speak with a Caucasian female police officer who was standing to his left,[4] this officer "pinned [him] onto the bench" and made some sort of physical contact with him, and two additional unnamed officers joined her in pinning Plaintiff to the bench,[5] pushing his body "really hard" in the process. (Plaintiff's Dep. at 53-56.)[6]

Plaintiff next was picked up off the bench and taken to an isolation cell to

---

[3]This portion of Plaintiff's encounter with the Defendant law enforcement officers was captured on video, and Defendants have produced a copy of this video as an exhibit to their motion. (*See* Defendants' Motion, Ex. E.) As discussed below, the parties have different views as to the events depicted in this video recording.

[4]Plaintiff testified that upon reviewing police reports and "putting things together," he determined that this officer was Deputy Collette Newman. (*Id.* at 53-54.)

[5]It appears from the record that these two other officers were Deputy Jason Thomas and Deputy Demetta Reeves.

[6]Deputy Newman testified at her deposition that she pushed Plaintiff back onto the bench after he tried to stand up and disregarded commands to stay seated. (*See* Plaintiff's Response, Ex. B, Newman Dep at 11, 17; *see also* Defendants' Motion, Ex. A, Newman Suppl. Report.) Plaintiff testified, in contrast, that he did not try to stand up or lift himself off the bench, and he also denied that he became combative as he sat on the bench. (Plaintiff's Dep. at 55-57.)

be searched.[7]  According to reports prepared by Sergeant Pam Sanchez, Deputy

Reeves, Deputy Newman, Deputy Thomas, and Deputy Brett Beckley, Plaintiff

was combative, uncooperative, and repeatedly disregarded verbal commands as

the officers attempted to search him, and he kicked Sergeant Sanchez in the face at

one point during this encounter.  (*See* Defendants' Motion, Ex. A, Sanchez Report;

Beckley Incident Report; Reeves Suppl. Report; Newman Suppl. Report; Thomas

Suppl. Report; *see also* Ex. H, Sanchez Dep. at 11, 18-21; Ex. I, Reeves Dep. at

19-25; Ex. J, Thomas Dep. at 21-23; Ex. M, Beckley Dep. at 14-24; Plaintiff's

Response, Ex. B, Newman Dep. at 10-16.)  The officers further stated that as

Plaintiff continued to actively resist their efforts to subdue and search him, they

administered OC spray and drive stun tasering.  (*See* Sanchez Dep. at 9; Thomas

Dep. at 23; Beckley Dep. at 18-24.)  Plaintiff testified, however, that he did not

intentionally kick any of the officers, and he denied that his foot ever made contact

with any officer's face.  (*See* Plaintiff's Dep. at 58-61.)

         According to Sergeant Sanchez's report, when the officers were unable to

subdue Plaintiff through the use of OC spray and drive stuns, Plaintiff was placed

in leg shackles and transported to the Genesee County Jail "so that he could be

_____

         [7]Plaintiff's brief stay in the isolation cell also was captured on video, and
Defendants have provided a copy of this video as well.  (*See* Defendants' Motion, Ex. E.)

secured better for his and the staff's safety." (Defendants' Motion, Ex. A, Sanchez Report at 1-2; *see also* Ex. F, Rule Dep. at 10 (explaining that it was "common practice[] to transport a prisoner that was noncompliant to the main jail," which was better equipped to handle this situation).)[8]  Deputy R. Nickleson and Lieutenant Matthew Rule stated in their reports that upon Plaintiff's arrival at the Genesee County Jail, he refused to comply with the officers' commands that he exit the police cruiser, so the officers had to remove him from the vehicle and carry him inside to a report writing area.  (*See* Defendants' Motion, Ex. A, Nickleson Incident Report; Rule Suppl. Report.)  In contrast, Plaintiff could not recall being ordered out of the police car, nor did he recall that the officers had to forcibly remove him from the vehicle.  (*See* Plaintiff's Dep. at 75.)

According to the incident reports prepared by Lieutenant Rule and Deputy Nickleson, when Plaintiff was brought into the report writing area of the county jail, he was instructed to face the wall and told that his handcuffs would be

---

[8]Plaintiff testified that as he was being carried in shackles from the Flint lockup to a police car to be transported to the Genesee County Jail, the officers who were carrying him slammed his forehead into a metal door frame and forcibly struck him in the abdomen.  (*See* Plaintiff's Dep. at 70-73.)  Plaintiff was unable to identify these officers, however, (*see id.* at 70-72), and it appears from the record that the officers who transported Plaintiff from the lockup to the county jail were employed by the Flint Police Department and are not parties to this suit, (*see* Defendants' Motion, Ex. A, Nickleson Incident Report at 1; Rule Suppl. Report at 1; Ex. F, Rule Dep. at 11).

removed.  (*See* Nickleson Incident Report; Rule Suppl. Report; *see also* Rule Dep. at 13-14.)[9]  Plaintiff then was directed to place his hands on the wall so that Deputy Nickleson could conduct a search, but Plaintiff instead pulled his hands off the wall.  (*See* Rule Dep. at 14-15; Nickleson Incident Report; Rule Suppl. Report.)  Lieutenant Rule testified that after he instructed Plaintiff repeatedly to leave his hands on the wall and Plaintiff failed to comply, he first warned Plaintiff that he would use OC spray if he continued to take his hands off the wall, and then administered a "one-second burst of OC spray" to Plaintiff's face when he failed to heed this warning.  (Rule Dep. at 15-17; *see also* Nickleson Suppl. Report.)  Plaintiff, in contrast, did not recall being asked to put his hands on the wall or failing to comply with any such instruction, but instead testified that he was pushed against the wall and that OC spray was administered without warning.  (*See* Plaintiff's Dep. at 79-80.)[10]

---

[9]There are no video recordings in the record that captured Plaintiff's encounters with law enforcement officers once he was moved from the Flint lockup to the Genesee County Jail.  Lieutenant Rule testified that there are video cameras in the booking area of the county jail, but that recordings are written over after approximately 29 days unless a request is made to preserve a recording.  (*See* Rule Dep. at 23-24.)

[10]In the excerpt of his deposition testimony that was provided to the Court, Plaintiff did not identify the officers involved in this encounter.  Indeed, Lieutenant Rule evidently was present at Plaintiff's deposition, and Plaintiff expressly testified that he had no contact with this individual on the night of the incidents giving rise to this suit.  (*See id.* at 79.)

According to Lieutenant Rule, because he and Deputy Nickleson were unable to conduct a search of Plaintiff in the report writing area due to his non-compliance and active resistance, the officers re-applied leg irons to Plaintiff and moved him to a safety cell so that the search could be completed.  (*See* Rule Dep. at 18-20.)  Lieutenant Rule further testified that upon removing Plaintiff's restraints in the safety cell, Plaintiff "began to kick and flail and actively resist" the officers' efforts to search him and commands to put his arms behind his back, and that another one-second burst of OC spray was administered at that time in an "attempt to regain control of the situation."  (*Id.* at 19-21; *see also* Nickleson Suppl. Report; Rule Suppl. Report.)  Two other officers, Sergeant William Tucker and Deputy Leon Skinner, evidently assisted in the attempted search of Plaintiff in the safety cell, and Sergeant Tucker stated in his report that he used pressure point compliance grips and peroneal strikes in an effort to counter Plaintiff's active resistance and secure his compliance, albeit to little or no effect.  (*See* Defendants' Motion, Ex. A, Tucker Suppl. Report.)[11]

---

[11]In the excerpts of his deposition that have been provided to the Court, Plaintiff has little to say about the time he spent in the safety cell at the county jail.  He testified at one point that he was "slamm[ed] . . . onto a metal bench face-first while [he] was in handcuffs," (Plaintiff's Dep. at 78), but he did not indicate where this occurred or identify the officers involved in this use of force.  Beyond this, Plaintiff recalled only that he was "moved to an isolation cell" by "perhaps two" officers and left there "for some time." (*Id.* at 81.)  Contrary to Plaintiff's assertion in his response to Defendants' motion, (*see*

Plaintiff remained in the Genesee County Jail for three days, and then visited an emergency room upon his release. (*See* Plaintiff's Dep. at 16-17.) He testified that he sustained an injury to his left hand and a closed head injury. (*See id.* at 15-17.) Plaintiff later was charged with three counts of assaulting, resisting, or obstructing a police officer, and he pled no contest to one of these three charges. (*See* Defendants' Motion, Ex. B, Information and Judgment.) This suit followed, with Plaintiff alleging in his complaint (i) that the Defendant law enforcement officers used excessive force against him following his March 26, 2013 arrest, (ii) that the Defendant Genesee County Sheriff is liable as the supervisor of the officers who employed excessive force, (iii) that the Defendant officers are subject to liability in their official capacities in light of the Genesee County policies and procedures that authorized their misconduct, and (iv) that the Defendant officers also are liable under Michigan law for assault and battery.[12]

### III. ANALYSIS

---

Plaintiff's Response Br. at 10), Plaintiff did not testify that he was "tased multiple times" or "beaten" at any point after his arrival at the Genesee County Jail, whether in the portion of his deposition testimony cited in support of this assertion or elsewhere in the excerpts of this testimony provided for the Court's review.

[12]As noted earlier, Plaintiff is no longer pursuing the other state-law theories of recovery asserted in his complaint, and he also has agreed to dismiss his claims against Undersheriff James Gage, Sergeant Pete Stocchi, and Deputies Timothy Lynch and Radmilla Hovey.

## A.    The Standards Governing Defendants' Motion

Through the present motion, the Defendant Genesee County law enforcement officers seek an award of summary judgment in their favor on Plaintiff's federal claims of excessive force and his state-law claims of assault and battery.  Under the Federal Rule governing this motion, summary judgment is proper "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). As the Supreme Court has explained, "the plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

In deciding a motion brought under Rule 56, the Court must view the evidence "in a light most favorable to the party opposing the motion, giving that party the benefit of all reasonable inferences."  *Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.,* 477 F.3d 854, 861 (6th Cir. 2007).  Yet, the nonmoving party may not rely on bare allegations or denials, but instead must support a claim of disputed facts by "citing to particular parts of materials in the record, including

11

depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Moreover, any supporting or opposing affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Finally, "[a] mere scintilla of evidence is insufficient" to withstand a summary judgment motion; rather, "there must be evidence on which the jury could reasonably find for the non-moving party." *Smith Wholesale,* 477 F.3d at 861 (internal quotation marks and citation omitted).

**B.    Issues of Fact Remain as to Whether Two of the Defendant Officers Used Excessive Force Against Plaintiff in the Report Writing Area of the Genesee County Jail, But Plaintiff's Remaining § 1983 Claims of Excessive Force Either Lack Evidentiary Support or Are Defeated by Qualified Immunity.**

Although Plaintiff's federal and state-law claims are not set forth in separate counts of his complaint, he alleges at various points in the complaint that the individual Defendant law enforcement officers violated his rights under the U.S. Constitution through their use of excessive and unreasonable force. (*See, e.g.,* Complaint at ¶¶ 10-11, 13(a), 14(c).) The Defendant officers now seek an award of summary judgment in their favor on these federal § 1983 claims of excessive

12

force, arguing (i) that the record establishes as a matter of law that the force employed against Plaintiff was not unreasonable, but instead was a necessary response to Plaintiff's active resistance and combative actions, and (ii) that even assuming there are issues of fact as to the reasonableness of the force used by one or more of the Defendant officers, the doctrine of qualified immunity would shield these officers from liability.

As Defendants observe, the Sixth Circuit has held that the Fourth Amendment standard of "reasonableness" governs the use of force against an individual like Plaintiff who is detained following a warrantless arrest, at least until the arrestee receives a probable cause hearing. *See Aldini v. Johnson,* 609 F.3d 858, 866-67 (6th Cir. 2010). Under this Fourth Amendment standard:

> [T]he officer's use of force [must] be objectively reasonable, balancing the cost to the individual against the government's interests in effecting the seizure. This standard contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case. The officer's subjective intentions are irrelevant to the Fourth Amendment inquiry.

*Phelps v. Coy,* 286 F.3d 295, 299 (6th Cir. 2002) (citations omitted). The Supreme Court has emphasized that "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor,* 490 U.S. 386,

13

396, 109 S. Ct. 1865, 1872 (1989).  Moreover, "[t]he difficulties of operating a

detention center must not be underestimated by the courts," and "[m]aintaining

safety and order at these institutions requires the expertise of correctional officials,

who must have substantial discretion to devise reasonable solutions to the

problems they face."  *Florence v. Board of Chosen Freeholders of County of*

*Burlington,* __ U.S. __, 132 S. Ct. 1510, 1515 (2012).

### 1.    Plaintiff's Encounter with Certain of the Defendant Officers in the Intake Area of the Flint Lockup

Plaintiff's interactions with the Defendant officers are most appropriately

analyzed in four segments.  *See Phelps,* 286 F.3d at 301.  Following his arrest,

Plaintiff first was taken to the City of Flint lockup, led to an intake area, and told

to sit on a bench.  In his response to Defendants' motion, Plaintiff summarizes the

events in this intake area in two brief sentences, citing his own deposition

testimony as establishing (i) that Defendant Newman pushed him onto a bench

while he was "handcuffed" and thus "unable to break his fall," and (ii) that he was

not "combative, threatening or verbally abusive to any deputies" during this

interaction.  (Plaintiff's Response Br. at 9 (citing Plaintiff's Dep. at 52, 55, 56).)  It

follows, in Plaintiff's view, that the Defendant officers who interacted with him in

the intake area acted in an "objectively unreasonable" manner by using "force

against a neutralized person." (Plaintiff's Response Br. at 20.)

Plaintiff's account of this incident in his summary judgment brief cannot be squared with the evidentiary record. Most notably, Plaintiff himself expressly denied at his deposition that he ever attempted to get up off the bench, (Plaintiff's Dep. at 55-57), and the video recordings of Plaintiff in the intake area of the Flint lockup likewise fail to disclose any effort by Plaintiff to get off the bench, (*see* Defendants' Motion, Ex. E, Camera 48 and Camera 49 Recordings). It follows — and the video recordings confirm — that Plaintiff was never pushed down onto the bench from a standing position while "handcuffed" and "unable to break his fall," as suggested by Plaintiff in his brief in opposition to Defendants' motion.

To be sure, the officers in the intake area employed at least some force against Plaintiff as he sat on the bench. In particular, the video recordings reveal — and Plaintiff likewise testified, (*see* Plaintiff's Dep. at 55) — that when Plaintiff slid down to the end of the bench at one point in order to speak to Deputy Newman, one or two officer responded by placing him back at the middle of the bench. About a minute later, as Plaintiff continued to verbally interact with the officers and slide around on the bench,[13] three officers forcibly moved him back to

---

[13]The video recordings lack sound, so it cannot be determined what Plaintiff or the officers were saying to each other.

the middle of the bench and pinned his back against the wall.  (*See id.* at 55-57.)

In Plaintiff's view, this record gives rise to issues of fact as to whether the

officers' use of force against him as he was handcuffed and "neutralized" was

objectively unreasonable.  (*See* Plaintiff's Response Br. at 20.)

The law is clear, however, that "[n]ot every push or shove . . . violates the

Fourth Amendment." *Graham,* 490 U.S. at 396, 109 S. Ct. at 1872.  Rather, the

Supreme Court has recognized that "police officers are often forced to make split-

second judgments — in circumstances that are tense, uncertain, and rapidly

evolving — about the amount of force that is necessary in a particular situation."

*Graham,* 490 U.S. at 397, 109 S. Ct. at 1872.  Thus, while the courts have

recognized that the Fourth Amendment is violated through the use of "gratuitous

violence" on an "incapacitated detainee," *Morrison v. Board of Trustees of Green*

*Township,* 583 F.3d 394, 407 (6th Cir. 2009), they have found no such violation

where an officer has employed an appropriate degree of force to achieve a valid

law enforcement objective, *see, e.g., Jackson v. Lubelan,* No. 15-2563, __ F.

App'x __, 2016 WL 4932166, at *3 (6th Cir. Sept. 16, 2016) (finding "no

precedent" for the conclusion that the defendant officers engaged in a "malicious

or gratuitous use of force" by pulling up on the plaintiff's handcuffed arms in an

effort to maneuver him into a police car); *Khother v. DeEulis,* No. 12-1929, 527 F.

16

App'x 461, 466 (6th Cir. June 6, 2013) (finding that the defendant officer "reasonably responded to a disruptive detainee" by "pull[ing] [the plaintiff] forward from his chair to lead him to a holding cell"); *Gorajczyk v. City of St. Clair Shores,* No. 08-14764, 2010 WL 3488646, at *6 (E.D. Mich. Aug. 31, 2010) (holding that the force used by the defendant officer was "not gratuitous," but instead was "designed to move [the plaintiff] into [his] home").

The Court finds that this latter line of cases is controlling here. There is no indication in the record that any officer punched, struck, or otherwise employed gratuitous force against Plaintiff while he was in the intake area of the Flint lockup. Nor did the officers use OC spray or a taser in this initial encounter with Plaintiff. Rather, the officers merely used the modest degree of force necessary to ensure that Plaintiff remained in the middle of the bench where he sat, so as to keep him at a safe distance from others in the intake area. When Plaintiff slid to one end of this bench, in close proximity to Deputy Newman, he was guided back to the middle of the bench in a non-violent manner. When he continued to move around on the bench while engaged in an animated discussion with the officers in the area, three of the officers forcibly brought him back to the middle of the bench and pinned him against the wall. The amount of force used in these encounters was reasonably tailored to the objective the officers sought to achieve, and could

17

by no means be characterized as "gratuitous" or "violent" in nature. Under this record, Plaintiff cannot establish a violation of his Fourth Amendment protection against the unreasonable use of force.

Even if issues of fact remained as to the reasonableness of the force used by the Defendant officers while Plaintiff was detained in the intake area of the Flint lockup, the Court finds that the doctrine of qualified immunity would shield the officers from liability. To overcome the officers' qualified immunity, Plaintiff must demonstrate that the "contours of the right [violated] . . . [were] sufficiently clear that a reasonable officer would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S. Ct. 3034, 3039 (1987); *see also Chappell v. City of Cleveland,* 585 F.3d 901, 907 (6th Cir. 2009) (confirming that it is the plaintiff's burden to show that the defendant is not entitled to qualified immunity). While it is not necessary that "the very action in question has previously been held unlawful," Plaintiff must show that the unlawfulness of the Defendant officers' conduct was "apparent" in light of pre-existing law. *Anderson,* 483 U.S. at 640, 107 S. Ct. at 3039. "If an officer, therefore, makes a mistake as to how much force is required, he will still be entitled to qualified immunity so long as that mistake was reasonable." *Solomon v. Auburn Hills Police Department,* 389 F.3d 167, 174 (6th Cir. 2004). In this

18

manner, "[q]ualified immunity will often operate to protect officers from the sometimes hazy border between excessive and acceptable force." *Solomon,* 389 F.3d at 174 (internal quotation marks and citations omitted).

Plaintiff has failed as a matter of law to establish that any Fourth Amendment violation committed by the Defendant officers in the intake area of the Flint lockup would have been apparent to these officers in light of pre-existing law.[14]  In his fairly terse discussion of qualified immunity as it applies to the facts presented here, Plaintiff relies principally on the Sixth Circuit's decisions in *Phelps, supra,* 286 F.3d at 301-02, and *McDowell v. Rogers,* 863 F.2d 1302, 1307 (6th Cir. 1988), for the proposition that the use of force against a neutralized, non-violent, and non-resisting detainee is objectively unreasonable.  (*See* Plaintiff's Response Br. at 20, 24.)[15]  As observed earlier, however, the cases cited by Plaintiff all involved the use of gratuitous force against an incapacitated and fully

---

[14]Defendants contend in their motion that the relevant pre-existing law for purposes of the Court's qualified immunity inquiry is the Fourteenth Amendment's "shocks the conscience" standard, since at the time of the incidents giving rise to this suit, the Sixth Circuit purportedly had not yet held that the Fourth Amendment standard of reasonableness governs the use of force against arrestees who have not yet received a probable cause hearing.  (*See* Defendants' Motion, Br. in Support at 15-16.)  The Sixth Circuit, however, adopted this Fourth Amendment standard in *Aldini,* 609 F.3d at 866-87, and this 2010 decision predated the events of this case by nearly three years.

[15]Plaintiff also cites the Sixth Circuit's decisions in *Robinson v. Bibb,* 840 F.2d 349, 351 (6th Cir. 1988), and *Yates v. City of Cleveland,* 941 F.2d 444, 447 (6th Cir. 1991), but these cases addressed the use of deadly force and provide no guidance here.

neutralized individual. *See Morrison,* 583 F.3d at 407 (addressing allegations that the defendant officer "repeatedly pushed [the plaintiff's] face to the ground every time she attempted to speak while she was already handcuffed, lying down, and compliant with the officer's commands"); *Phelps,* 286 F.3d at 297, 301 (considering evidence that after the defendant officer "tackled the handcuffed [plaintiff] and was sitting on top of him," the officer "hit [the plaintiff] in the face twice" and "banged his head into the floor at least three times"); *McDowell,* 863 F.2d at 1303 (evidence at trial indicated that "after [the plaintiff] had been handcuffed, and at a time when he was offering no resistance, one of the [defendant] officers hit him with a nightstick, breaking a rib").

As already discussed, the record here fails to disclose any use of gratuitous or violent force against Plaintiff in the intake area of the Flint lockup. Instead, the evidence shows that the Defendant officers employed only modest force against Plaintiff to keep him positioned near the center of the bench where he was seated, and that these actions served the legitimate law enforcement objectives of ensuring officer safety and maintaining order in the intake area. Because Plaintiff has not demonstrated that the officers' actions in the intake area violated any clearly established Fourth Amendment standard of reasonableness, it follows that the officers are entitled to qualified immunity.

20

**2.      The Use of Force Against Plaintiff in an Isolation Cell at the Flint Lockup**

After he initially was placed on a bench in the intake area, Plaintiff next was moved to an isolation cell to be searched.  According to the Defendant officers involved in this encounter — specifically, Sergeant Sanchez, Deputy Reeves, Deputy Newman, Deputy Thomas, and Deputy Beckley — Plaintiff was combative, uncooperative, and repeatedly disregarded verbal commands as the officers attempted to search him, and he kicked Sergeant Sanchez in the face during the course of this struggle.  The officers testified that in response to Plaintiff's active resistance, they administered OC spray and drive stuns with their tasers.  (*See* Sanchez Dep. at 9, 19-21; Thomas Dep. at 21-23; Beckley Dep. at 17-24.)  Plaintiff testified, in contrast, that he did not intentionally kick any of the officers, and he denied that his foot ever made contact with any officer's face. (*See* Plaintiff's Dep. at 58-61.)

In arguing that his Fourth Amendment rights were violated during this encounter, Plaintiff again relies on the principle that it is unreasonable to inflict gratuitous force against a neutralized and compliant detainee.  Yet, beyond his testimony that he did not kick anyone, Plaintiff has produced no evidence that he was compliant, cooperative, non-combative, or non-resistant as the Defendant

21

officers attempted to search him in the isolation cell.[16]  Consequently, the

testimony of the Defendant officers as to Plaintiff's various acts of resistance —

including flailing about, kicking his legs, yelling, struggling with the officers, and

disregarding the officers' verbal commands, (*see* Sanchez Dep. at 11, 19; Reeves

Dep. at 19-25; Thomas Dep. at 21-23; Beckley Dep. at 14-23)  — stands unrefuted

in the record.[17]  Against this evidentiary backdrop of force used to subdue a

combative and non-compliant detainee, Plaintiff cannot show that the Defendant

officers violated the Fourth Amendment protection against the unreasonable use of

force during the time that Plaintiff was detained and searched in an isolation cell at

---

[16]As noted earlier, the parties have produced only selected excerpts of Plaintiff's deposition testimony.  To the extent that Plaintiff might have described in greater detail what transpired while he was kept in the isolation cell in the Flint lockup, no such testimony is in the record before this Court.

[17]In his response to Defendants' motion, Plaintiff seemingly suggests that the video recording of his time in the isolation cell contradicts the officers' testimony as to what transpired in this cell.  Yet, he does not identify any specific portions of the recording that disclose the use of force against a neutralized and compliant detainee.  Neither does the Court's own review of this recording cast doubt on the account of the Defendant officers, where (i) Plaintiff's upper body generally is not visible, (ii) his legs regularly move about during the recording, whether due to his own flailing or the officers' repositioning of his body as they conduct their search, and (iii) there is no audio that would either corroborate or contradict the officers' testimony that Plaintiff repeatedly disregarded their verbal commands and warnings.  Accordingly, while the courts have deemed it appropriate to disregard a party's account that is "blatantly contradicted" by video evidence, *Scott v. Harris,* 550 U.S. 372, 380, 127 S. Ct. 1769, 1776 (2007); *see also Griffin v. Hardrick,* 604 F.3d 949, 954 (6th Cir. 2010), the video recordings in this case provide no such basis for discounting the testimony of the Defendant officers.

the Flint lockup.

### 3. Plaintiff's Encounter with Certain of the Defendant Officers in the Report Writing Area of the Genesee County Jail

Following his brief stay in an isolation cell at the Flint lockup, Plaintiff was placed in leg shackles and transported to the Genesee County Jail.[18]  Upon his arrival, Defendants Rule and Nickleson brought him to the report writing area of the county jail, where he was instructed to face the wall and advised that his handcuffs would be removed.  (*See* Rule Dep. at 13-14.)  According to Lieutenant Rule, Plaintiff then "was given loud, clear verbal commands to place his hands on the wall" so that Deputy Nickleson could conduct a search, but Plaintiff disregarded this order and "pulled his hands off the wall."  (*Id.* at 14.)  Lieutenant Rule testified that after Plaintiff disregarded three such commands, he was warned that the officers would use OC spray if he continued to resist their instructions.

---

[18]As noted earlier, Plaintiff testified that while he was being moved from the Flint lockup to the police car that would transport him to the county jail, the officers who were carrying him slammed his forehead into a metal door frame and punched him in the abdomen.  (*See* Plaintiff's Dep. at 70-73.)  Plaintiff could not identify these officers, however, nor could he say whether the officers were employed by the City of Flint or Genesee County.  (*See id.* at 70-72.)  Accordingly, because Plaintiff has named only Genesee County law enforcement officers as defendants in this case, and because it is a well-established principle of federal § 1983 law that "[e]ach defendant's liability must be assessed individually based on his own actions," *Binay v. Bettendorf,* 601 F.3d 640, 650 (6th Cir. 2010), the unlawful force allegedly used against Plaintiff as he was transported from the Flint lockup to the Genesee County Jail cannot serve as the basis for a § 1983 claim against any of the Defendant officers.

23

(*See id.* at 15-16.)  When Plaintiff still refused to comply despite this warning, Lieutenant Rule applied a "one-second burst of OC spray" to Plaintiff's face.  (*Id.* at 16-17.)

Plaintiff's recollection of this encounter is different.  He testified that upon entering the report writing area, he was pushed against the wall, his pants were "ripped off," and OC spray was administered without warning.  (Plaintiff's Dep. at 79-80.)  Plaintiff could not recall being given a verbal command to put his hands on the wall, nor did he recall that he was given any warning that OC spray would be administered if he removed his hands from the wall.  (*See id.* at 79-80.)  Rather, Plaintiff testified that he was "always compliant during this whole incident."  (*Id.* at 80.)

This factual dispute precludes the determination sought in Defendants' motion — namely, that the force employed by the Defendant officers during their encounter with Plaintiff in the report writing area of the county jail was reasonable as a matter of law.  The Sixth Circuit has recognized that the use of pepper spray on an individual who is secured and compliant constitutes excessive force.  *See Champion v. Outlook Nashville, Inc.,* 380 F.3d 893, 903 (6th Cir. 2004).  Accepting Plaintiff's account as true, this is what happened here.  Moreover, the Defendant officers cannot appeal to qualified immunity as to this incident, because

24

the principle recognized in *Champion* was deemed "clearly established" at the time of this 2004 decision. 380 F.3d at 903. Accordingly, Plaintiff may go forward with his § 1983 claims of excessive force against the two Defendant officers involved in this incident, Lieutenant Rule and Deputy Nickleson.[19]

### 4. The Use of Force Against Plaintiff in a Safety Cell at the County Jail

The fourth and final incident giving rise to Plaintiff's § 1983 claims of excessive force occurred when Plaintiff was placed back in leg irons and moved to a safety cell at the Genesee County Jail. According to Lieutenant Rule, after Plaintiff was taken to the safety cell and his restraints were removed, he "began to kick and flail and actively resist" the officers' efforts to conduct a strip search. (Rule Dep. at 19-20.) When Plaintiff disregarded Lieutenant Rule's "loud, clear verbal commands" and continued to "kick[] and flail[] and pull[] his arms away," the officer "administered an additional one-second burst of OC spray to attempt to

---

[19]Notably, in the excerpts of his deposition testimony provided for the Court's review, Plaintiff did not identify the officers who participated in the incident in the report writing area of the county jail. Indeed, Plaintiff was expressly asked whether he had any contact with Lieutenant Rule on the night of the incidents giving rise to this suit, and he responded that he "did not." (Plaintiff's Dep. at 79.) Nonetheless, the record is clear that Lieutenant Rule and Deputy Nickleson were the two Defendant officers who escorted Plaintiff to the report writing area and attempted to conduct a search, and Lieutenant Rule specifically testified that he administered OC spray to Plaintiff's face. Consequently, there is no concern that a Defendant officer might face liability for activities in which he did not participate.

regain control of the situation." (*Id.* at 20-21.)  Another officer on the scene,

Defendant Tucker, stated in a police report that he used pressure point compliance

grips and peroneal strikes in an attempt to counter Plaintiff's active resistance and

secure his compliance, but that these efforts were largely unavailing.  (*See*

Defendants' Motion, Ex. A, Tucker Suppl. Report.)

Plaintiff has failed to dispute any of the facts set forth in the Defendant

officers' accounts of this incident.  Although Plaintiff claims in his response to

Defendants' motion that he was "tased multiple times, sprayed with OC spray and

beaten" upon his arrival at the Genesee County Jail, (Plaintiff's Response Br. at

10), the deposition testimony cited in support of this assertion addresses an

altogether different encounter, and not anything that occurred in the county jail.[20]

Even assuming that the Court owed a duty to search the record on Plaintiff's

behalf, the sole apparent reference to this incident in Plaintiff's deposition

testimony is his recollection that he was "left in an isolation cell for some time."

(Plaintiff's Dep. at 81.)  In the portions of his deposition testimony that have been

submitted to the Court, Plaintiff did not state that he was subjected to force in this

isolation cell, nor did he indicate whether he was fully neutralized or compliant at

---

[20]Specifically, the cited excerpt of Plaintiff's deposition testimony concerns force
inflicted on him as he was taken from the Flint lockup to a police car in preparation for
his transport to the county jail.  (*See* Plaintiff's Dep. at 72.)

the time any such force was employed.[21]

Under this record, Plaintiff cannot establish that any Defendant officer used excessive force against him while he was held in a safety cell at the county jail. Although Lieutenant Rule and Sergeant Tucker have stated that they employed such measures as OC spray, pressure point compliance grips, and peroneal strikes, the record demonstrates without contradiction that they did so only after Plaintiff actively resisted their efforts to search him and failed to comply with their verbal commands that he cease this resistance. The law is clear that a police officer may employ a reasonable degree of force to restrain an individual who is uncooperative and actively resisting legitimate law enforcement objectives such as a search, *see, e.g., Khother,* 527 F. App'x at 466; *Hagans v. Franklin County Sheriff's Office,* 695 F.3d 505, 509 (6th Cir. 2012); *Caie v. West Bloomfield Township,* No. 11-1378, 485 F. App'x 92, 96-97 (6th Cir. June 18, 2012); *Burchett v. Kiefer,* 310 F.3d 937, 944 (6th Cir. 2002); *Brady v. City of Westland,* 1 F. Supp.3d 729, 739-40 (E.D. Mich. 2014), and there is no evidence that any Defendant officer acted in excess of this lawful authority during the period that Plaintiff was detained in a

---

[21]As noted earlier, Plaintiff testified at one point in his deposition that he was slammed face-first onto a metal bench while in handcuffs. (*See id.* at 78.) He did not indicate where this incident occurred, however, nor did he identify the officers involved in this use of force. Consequently, it would be a matter of pure conjecture to determine whether this incident occurred in a safety cell at the county jail.

safety cell.  Accordingly, the Defendant officers are awarded summary judgment in their favor on Plaintiff's § 1983 claims of excessive force arising from this incident.

## C.   Plaintiff Has Failed to Provide Evidentiary Support for His Claims Against the Defendant Officers in Their Official Capacities.

In his complaint, Plaintiff evidently has brought his claims against the Defendant law enforcement officers in both their individual and their official capacities.  As to the latter, claims against an officer in his or her official capacity are treated as claims against the governmental entity by which the officer is employed.  *See Hafer v. Melo,* 502 U.S. 21, 25, 112 S. Ct. 358, 361 (1991); *Mason v. City of Warren Police Department,* No. 10-14182, 2011 WL 5025841, at *11 (E.D. Mich. Oct. 21, 2011).  In this case, therefore, Plaintiff's official-capacity claims are governed by the standards applicable to claims against Genesee County.

Under well-settled principles, the County "cannot be held liable under § 1983 for an injury inflicted solely by its employees or agents."  *Gregory v. Shelby County,* 220 F.3d 433, 441 (6th Cir. 2000) (citing *Monell v. Department of Social Servs.,* 436 U.S. 658, 694, 98 S. Ct. 2018, 2037 (1978)).  Rather, "[f]or liability to attach, there must be execution of a government's policy or custom which results in a constitutional tort."  *Gregory,* 220 F.3d at 441.  Moreover, Plaintiff must

28

establish that "through its deliberate conduct, the [County] was the 'moving force' behind" the violation of his constitutional rights — that is, he "must show that the [County's] action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the [County's] action and the deprivation of federal rights." *Gregory,* 220 F.3d at 442 (quoting *Board of County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 405, 117 S. Ct. 1382, 1389 (1997)).

As Defendants observe, Plaintiff's complaint is devoid of allegations identifying any Genesee County policy or custom that led to the deprivation of his Fourth Amendment rights. He fares little better in his response to Defendants' motion, suggesting in vague and conclusory fashion that evidence of the requisite Genesee County policy or custom can somehow be found in the video recordings of Plaintiff's encounters with the Defendant officers in the Flint lockup. (*See* Plaintiff's Response Br. at 14.) Yet, the Court already has determined that Plaintiff's Fourth Amendment rights were not violated in these encounters, and it follows that Genesee County cannot be charged with liability for these incidents. *See Watkins v. City of Battle Creek,* 273 F.3d 682, 687 (6th Cir. 2001).

Plaintiff arguably also seems to suggest that the County's failure to investigate the incidents giving rise to this suit or discipline any of the officers involved may serve as evidence of a County policy or practice of acquiescing in

29

officer misconduct.  (*See* Plaintiff's Response Br. at 13-14.)  As a threshold matter, however, Plaintiff provides no evidentiary support for his claim that there was no investigation of the incidents that triggered this action.  To the contrary, Sheriff Pickell testified that he reviewed the video recordings of Plaintiff's encounters with the Defendant officers at the Flint lockup.  (*See* Defendants' Motion, Ex. K, Pickell Dep. at 26; *see also* Plaintiff's Response Br. at 17 (acknowledging that "[t]he incident complained of here was investigated the following morning").)

In any event, while a mishandled investigation or inadequate disciplinary measures can serve as evidence of a "policy, custom, or practice . . . of condoning" wrongdoing by police officers, this evidence must be accompanied by a showing "that the flaws in this particular investigation were representative of (1) a clear and persistent pattern of illegal activity, (2) which the [County] knew or should have known about, (3) yet remained deliberately indifferent about, and (4) that the [County's] custom was the cause of" the particular misconduct committed in this case. *Thomas v. City of Chattanooga,* 398 F.3d 426, 432-33 (6th Cir. 2005). Plaintiff has not even attempted such a showing here.  Indeed, as his sole example of "wrongdoing" that the County allegedly condoned, Plaintiff points to the video and the testimony of Defendant Newman as purportedly revealing that this officer

30

pushed him while he was handcuffed and caused him to "fall[] 'face-first' into a bench in the booking area."  (Plaintiff's Response Br. at 15.)  As already discussed, however, the evidentiary record conclusively refutes this account of Plaintiff's interactions with Deputy Newman.  Accordingly, Plaintiff's official-capacity claims against the Defendant officers are subject to dismissal as inadequately pled and for lack of evidentiary support.

**D.    Plaintiff Has Failed to Provide a Basis for Charging Sheriff Pickell with Liability for any Violations of His Federal Constitutional Rights.**

As his final claim brought under § 1983, Plaintiff seeks to hold Genesee County Sheriff Pickell liable for the deprivation of his Fourth Amendment right to be free from excessive force.  Plaintiff acknowledges that this claim cannot rest solely on Sheriff Pickell's supervisory authority over or right to control the Defendant officers who allegedly violated his Fourth Amendment rights.  *See Shehee v. Luttrell,* 199 F.3d 295, 300 (6th Cir. 1999).  Rather, Plaintiff must show that Sheriff Pickell "either encouraged the specific incident of misconduct [by a Defendant officer] or in some other way directly participated in it."  *Shehee,* 199 F.3d at 300 (internal quotation marks and citation omitted).  "At a minimum a plaintiff must show that the [supervisory] official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the

31

offending officers." *Shehee,* 199 F.3d at 300 (internal quotation marks and citation omitted).

In an effort to make this showing, Plaintiff points to Sheriff Pickell's determination following an investigation that the Defendant officers acted appropriately. (*See* Plaintiff's Response Br. at 17.)[22] Because the record, in Plaintiff's view, demonstrates that the Defendant officers did ***not*** act appropriately, Plaintiff suggests that Sheriff Pickell's failure to take action following his investigation reflects his approval of or knowing acquiescence in officer misconduct, and thereby provides a basis for charging him with liability.

Once again, however, the evidentiary support for this theory of liability is lacking. As his sole example of officer misconduct in which Sheriff Pickell purportedly acquiesced, Plaintiff cites the video recording that discloses the use of OC spray on Plaintiff after he was placed in an isolation cell at the Flint lockup. In Plaintiff's view, this application of OC spray was inconsistent with a "general order" that purportedly prohibits the use of OC spray on an individual who is lying

---

[22]Plaintiff notably fails to cite any evidence in support of this assertion. So far as the Court is aware, the record discloses only that Sheriff Pickell reviewed the video recordings of the encounters between Plaintiff and certain of the Defendant officers while Plaintiff was detained at the Flint lockup, and that Sheriff Pickell concluded upon this review that the officer conduct captured in these recordings was appropriate. (*See* Pickell Dep. at 26.)

down on the ground and in restraints or otherwise subdued.  (*See* Plaintiff's

Response Br. at 17.)[23]  Yet, as previously discussed, Plaintiff has failed to produce

evidence that he was compliant and neutralized at the time OC spray was

administered in the isolation cell, nor does the video recording of this encounter

evidence any such compliance.  Consequently, the sole factual predicate for

Plaintiff's § 1983 claim against Sheriff Pickell lacks evidentiary support, and

Sheriff Pickell therefore is entitled to summary judgment in his favor on this

claim.

**E.    Issues of Fact Remain as to Plaintiff's State-Law Claims of Assault and Battery Against Defendants Rule and Nickleson Arising from the Incident in the Report Writing Area of the Genesee County Jail, But Plaintiff's Remaining Assault and Battery Claims Are Defeated by Governmental Immunity.**

Although Plaintiff arguably has asserted a variety of state-law claims in his

complaint, he clarifies in his response to Defendants' motion that he only wishes

to pursue his state-law claims of assault and battery against the Defendant officers.

Unfortunately, the parties touch upon this state-law theory of recovery only briefly

in their summary judgment submissions.  Defendants address this state-law theory

---

[23]As Defendants observe, the "general order" quoted by Plaintiff is unsupported by citation to the record, nor does it appear that a copy of any such order has been provided for the Court's review.  Thus, Plaintiff cannot properly rely on this general order as evidentiary support for his claim against Sheriff Pickell.

and Plaintiff's federal § 1983 claims of excessive force together, (*see* Defendants'
Motion, Br. in Support at 12-13), without citing any state law whatsoever that
might govern the former theory of recovery.  Plaintiff, for his part, references the
qualified immunity conferred upon the Defendant officers under Michigan law,
(*see* Plaintiff's Response Br. at 17-19), but then makes no effort to demonstrate
why this immunity should be unavailable under the facts of this case.  Thus left to
its own devices, the Court addresses Plaintiff's state-law claims only briefly, and
concludes that these claims withstand summary judgment to the same extent as
Plaintiff's analogous § 1983 claims of excessive force.

Under Michigan's Governmental Tort Liability Act ("GTLA") as construed
by the Michigan Supreme Court, the individual Defendant law enforcement
officers are immune from liability for the state-law intentional tort claims asserted
in Plaintiff's complaint if — among other elements that are not at issue here —
their actions "were undertaken in good faith, or were not undertaken with malice."
*Odom v. Wayne County,* 482 Mich. 459, 480, 760 N.W.2d 217, 228 (2008).  In
contrast to the objective standard of reasonableness that governs a qualified
immunity inquiry under § 1983, the good faith standard under Michigan's
governmental immunity law is "subjective, not objective."  *Romo v. Largen,* 723
F.3d 670, 677 (6th Cir. 2013); *see also Cohn v. DeWeese,* No. 09-12187, 2010 WL

34

3906227, at *21 (E.D. Mich. Sept. 30, 2010). Nonetheless, both the Sixth Circuit and this Court have recognized that "[t]he question of an officer's good faith under Michigan law overlaps considerably, if not entirely, with [the federal qualified immunity] analysis of whether the officer's actions were objectively reasonable under the circumstances." *Malory v. Whiting,* No. 11-1468, 489 F. App'x 78, 86 (6th Cir. July 13, 2012); *see also Cohn,* 2010 WL 3906227 at *21-22.

Against this backdrop, the Court's earlier analysis of Plaintiff's Fourth Amendment claims of excessive force is largely dispositive of Plaintiff's state-law claims of assault and battery. As previously explained, the force used by the Defendant officers in the Flint lockup and in the safety cell at the Genesee County Jail did not transgress the Fourth Amendment protection against unreasonable seizures. On the other hand, the Court determined that issues of fact remain as to the reasonableness of the force employed by Defendants Rule and Nickleson during their encounter with Plaintiff in the report writing area of the county jail. Neither side has suggested any basis for the Court to depart from these findings in determining under Michigan law whether the challenged actions of the Defendant officers were undertaken in good faith and without malice. Accordingly, to the same extent that Plaintiff's § 1983 claims of excessive force withstand summary judgment, his analogous state-law claims of assault and battery likewise may go

35

forward.

## IV.  <u>CONCLUSION</u>

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendants'

September 30, 2015 motion for summary judgment (docket #55) is GRANTED IN

PART and DENIED IN PART, in accordance with the rulings in this opinion and

order.  Specifically, Plaintiff may go forward with his federal 42 U.S.C. § 1983

claims of excessive force and his state-law claims of assault and battery against

Defendants Rule and Nickleson arising from the March 26, 2013 encounter

between Plaintiff and these two officers in the report writing area of the Genesee

County Jail, but summary judgment is awarded in Defendants' favor as to (i)

Plaintiff's remaining § 1983 and state-law claims against these two Defendant

officers, and (ii) Plaintiff's federal and state-law claims against all other

Defendants.

     SO ORDERED.

                          s/Gerald E. Rosen_____
                          United States District Judge

Dated:  December 27, 2016

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on December 27, 2016, by electronic and/or ordinary mail.

                          s/Julie Owens_____
                          Case Manager, (313) 234-5135